**No. 22-35146**
PRO BONO

_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

U.S. BANK NATIONAL ASSOCIATION,
Plaintiff-Appellee

v.

QUARTZBURG GOLD LP; IDAHO STATE REGIONAL CENTER LLC,
Defendants-Appellees,

v.

YING LIN; YUN HUANG,
Defendants-Appellants

and

YUNTIAN DENG; et al.,
Defendants.

_____

On Appeal from the U.S. District Court for the Western District of Washington,
No. 2:20-cv-00993-RSM (Hon. Ricardo S. Martinez)

_____

**APPELLANTS YING LIN AND YUN HUANG'S OPENING BRIEF**

_____

Andrew B. Erickson
LANDYE BENNETT BLUMSTEIN LLP
701 W. 8th Avenue, Suite 1100
Anchorage, Alaska 99501
(907) 276-5152
andye@lbblawyers.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

INTRODUCTION ....................................................................1

STATEMENT OF JURISDICTION ...................................................4

STATEMENT OF THE ISSUES ....................................................5

AUTHORITIES .......................................................................6

STATEMENT OF THE CASE .........................................................6

    1.    The EB-5 Program ....................................................6

    2.    The Master Escrow Agreement ......................................10

    3.    *Chen v. U.S. Bank* and *SEC v. Muroff* ................................14

    4.    Proceedings Below ....................................................18

SUMMARY OF THE ARGUMENT ..................................................20

STANDARD OF REVIEW ..........................................................22

ARGUMENT ........................................................................23

    I.    The Huangs Were Entitled to Summary Judgment and the
        Return of Their $500,000 Deposit Because the Condition
        Precedent for Releasing their Funds from
        Escrow Never Occurred ..............................................23

    II.    Quartzburg's Motion for Summary Judgment Should Have
        Been Denied Because It Failed to Show the Huangs'
        Deposit Was Disbursed from the Escrow Account ....................30

    III.    The Rule that Equity Demands Pro Rata Distribution
        Does Not Apply to Funds Held in an Escrow Account ................35

CONCLUSION ......................................................................................39

STATEMENT OF RELATED CASES .................................................40

CERTIFICATE OF SERVICE .............................................................41

CERTIFICATE OF COMPLIANCE (FORM 8) ..................................42

# TABLE OF AUTHORITIES

## Cases

*Aetna Life Ins. Co. v. Bayona*,
    223 F.3d 1030 (9th Cir. 2000) .......................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................23

*Anderson v. Stephens*,
    875 F.2d 76 (4th Cir. 1989) ..........................................................37

*Behring Reg'l Ctr. v. Wolf*,
    544 F. Supp. 3d 937 (N.D. Cal. 2021) ...........................................8

*Celotex Corp v. Catrett*,
    477 U.S. 317 (1986) .............................................................21, 31

*Chen v. U.S. Bank*,
    No. 2:16-cv-1109RSM,
    2020 U.S. Dist. LEXIS 36773 (W.D. Wash. Mar. 3, 2020) ..................*passim*

*Chen v. U.S. Bank*,
    507 F. Supp. 3d 1254 (W.D. Wash. 2020) ...........................14, 15,

*City of Philadelphia v. Lieberman*,
    112 F.2d 424 (3d Cir. 1940) ...........................................22, 37, 38

*Clayton's Case*,
    1 Merivale 572 (1816 Ch.) ..........................................................35

*Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*,
    205 F.3d 1107 (9th Cir. 1999) ......................................................36

*Csutoras v. Paradise High Sch.*,
    12 F.4th 960 (9th Cir. 2021) .........................................................22

*Cunningham v. Brown*,
    265 U.S. 1 (1924) ..........................................................35, 36, 37

iii

*Davis v. United States*,
    854 F.3d 594 (9th Cir. 2017) ...................................................................21, 31

*Doe v. U.S. Citizenship and Immigration Servs.*,
    410 F. Supp. 3d 86 (D.D.C. 2019) ................................................1, 10, 12, 13

*Doe v. U.S. Customs and Immigration Servs.*,
    329 F. Supp. 3d 297 (D.D.C. 2017) ...........................................................13

*Doe v. U.S. Customs and Immigration Servs.*,
    No. 1:15-cv-00273-CKK (D.D.C.) ..............................................................13

*Eat Right Foods, Ltd. v. Whole Foods Mkt., Inc.*,
    880 F.3d 1109 (9th Cir. 2017) ....................................................................33

*Fan v. U.S. Bank*,
    No. 2:19-cv-01545-RSM (W.D. Wash.) ...................................................16

*In re Cannon*,
    277 F.3d 838 (6th Cir. 2002) ......................................................................27

*Knatchbull v. Hallett*,
    L.R. 13 Ch. D. 696 ......................................................................................36

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    408 F.3d 596 (9th Cir. 2005) ......................................................................23

*Lechner v. Halling*,
    216 P.2d 179 (Wash. 1950) ..................................................................26, 38

*Libby, McNeill, and Libby v. City Nat'l Bank*,
    592 F.2d 504 (9th Cir. 1978) ........................................................................4

*Lizardo v. Denny's, Inc.*,
    270 F.3d 94 (2d Cir. 2001) .........................................................................37

*Lummis v. White*,
629 F.2d 397 (5th Cir. 1980)
*rev'd on other grounds by Cory v. White*, 457 U.S. 85 (1982) ....................23

*Luo v. Quartzburg*,
No. 16-2-21975-6-SEA (Wash. Super. Ct.) ...................................................16

*Mao v. U.S. Bank*,
No. 2:16-cv-01113-RSM (W.D. Wash.) ...................................................2, 14

*Marianas Pub. Land Trust v. Gov.'t of N. Mariana Islands.*,
838 F.2d 341 (9th Cir. 1988) ............................................................25, 26, 38

*Minn. Mut. Life Ins. Co. v. Ensley*,
174 F.3d 977 (9th Cir. 1999) ........................................................................23

*Nat'l Bank of Wash. v. Equity Investors*,
506 P.2d 20 (Wash. 1973) ........................................................24, 26, 27, 28

*Path Am. KingCo LLC v. U.S. Dep't of Homeland Sec.*,
426 F. Supp.3d 770 (W.D. Wash. 2019) .........................................................8

*Porter v. Cal. Dep't of Corr.*,
419 F.3d 885 (9th Cir. 2005) ........................................................................34

*Scully v. Pac. States Sav. & Loan Co.*,
88 F.2d 384 (9th Cir. 1937) ..........................................................................28

*SEC v. Black*,
163 F.3d 188 (3d Cir. 1998) .........................................................................37

*SEC v. Bivona*,
No. 16-cv-01386-EMC,
2017 U.S. Dist. LEXIS 148575 (N.D. Cal. Sept. 13, 2017) ...................20, 36

*SEC v. Byers*,
637 F. Supp. 2d 166 (S.D.N.Y. 2009) .....................................................36, 37

*SEC v. Credit Bancorp, Ltd.*,
290 F.3d 80 (2d Cir. 2002) .....................................................................37, 38

*SEC v. Hui Feng*,
  935 F.3d 721 (9th Cir. 2019) ......................................................6, 7

*SEC v. Muroff*,
  No. 1:17-cv-00180-EJL,
  2018 U.S. Dist. LEXIS 221745 (D. Idaho Dec. 4, 2018) ...............16, 17, 18

*SEC v. Path America, LLC*,
  No. C15-1350-JLR,
  2016 U.S. Dist. LEXIS 47337 (W.D. Wash. Apr. 6, 2016) ...................30, 31

*Shao v. Muroff*,
  No. 1:18-cv-00295-BLW (D. Idaho) ....................................................16, 18

*Simo v. Union of Needletrades*,
  322 F.3d 602 (9th Cir. 2003) ..........................................................23

*Soc. Techs. LLC v. Apple, Inc.*,
  4 F.4th 811 (9th Cir. 2021) ..........................................................23

*Spencer Enters. v. United States*,
  345 F.3d 683 (9th Cir. 2003) ...........................................................8

*Suzuki Motor Corp. v. Consumers Union, Inc.*,
  330 F.3d 1110 (9th Cir. 2003) .......................................................23

*United States v. Durham*,
  86 F.3d 70 (5th Cir. 1996) .................................................37, 38

*U.S. v. Real Property Located at 13328 & 13324 State Hwy., 75 N.*,
  89 F.3d 551 (9th Cir. 1996) .................................................35, 36

*United State v. Wilson*,
  659 F.3d 947 (9th Cir. 2010) .......................................................36

*Wash. Legal Found. v. Legal Found. of Wash.*,
  271 F.3d 835 (9th Cir. 2001) .......................................................27

## Federal Statutes

8 U.S.C. § 1153(b)(5)(C)(i)-(ii) (2012) ...........................................6, 7, 8

8 U.S.C. § 1186(b) (2012) ..................................................................9

28 U.S.C. § 1291 ...............................................................................5

28 U.S.C. § 1332 ...............................................................................5

28 U.S.C. § 1335 ...............................................................................4

Pub. L. No. 117-103 (2022) ...............................................................7

Pub. L. No. 101-649, § 121(a) (Nov. 29, 1990)
    (codified at 8 U.S.C. § 1153(b)(5)) ............................................6

## Federal Regulations

8 C.F.R. § 204.6(e) (Jan. 2012) .........................................................7

8 C.F.R. § 204.6(j)(2) (Jan. 2012) .................................................8, 13

## Court Rules

Federal Rule of Appellate Procedure 4(a)(1)(B) ................................5

## Other Authorities

28 Am. Jur.2d Escrows § 27 (May 2023) ..........................................25

30A C.J.S. Escrows § 6 (May 2023) ..................................................27

30A C.J.S. Escrows § 8 (1965) .........................................................24

30A C.J.S. Escrows § 21 (May 2023) ....................................................27

30A C.J.S. Escrows § 37 (May 2023) ....................................................25

30A C.J.S. Escrows § 39 (May 2023) ....................................................29

4 Tiffany, Real Property § 1048 (3d ed., Sept. 2022) .............................26

Bogert's The Law of Trusts and Trustees § 966 (June 2023) .................28

Dep't of Homeland Security, U.S. Citizenship and Immigration Services,
    Policy Manual, Vol. 6, Part G, Ch. 1, https://www.uscis.gov/policy-
    manual/volume-6-part-g-chapter-1
    (Jul. 6, 2023) ("EB-5 Policy") .............................................7, 8, 9

Restatement (Second) of Trusts § 32 cmt. d (2012) .............................26

USCIS, Form I-797C, Notice of Action, https://www.uscis.gov/forms/all-
    forms/form-i-797c-notice-of-action ...............................................9

## INTRODUCTION

Ying Lin and Yun Huang (the "Huangs") are Chinese nationals who hoped to immigrate to the United States under the EB-5 Immigrant Investor Program—a federal program authorizing visas for certain foreign investors in U.S. businesses. In November 2012, the Huangs deposited $500,000 into an escrow account managed by U.S. Bank National Association ("U.S. Bank") on behalf of Quartzburg Gold, L.P. ("Quartzburg"), an Idaho limited partnership, and its affiliated entity, Idaho State Regional Center, LLC ("ISRC"). *See* 2-ER-108-09.

Quartzburg's business plan involved aggregating investments from prospective EB-5 immigrant investors and using those funds to invest in mining projects in Idaho and Montana. *See Doe v. U.S. Citizenship and Immigration Servs*., 410 F. Supp. 3d 86, 92 (D.D.C. 2019) (describing Quartzburg's investment structure). Under the terms of an escrow agreement among U.S. Bank, Quartzburg, and ISRC, which the Huangs subsequently agreed to by executing a joinder, the Huangs' deposit would be released from escrow and invested in Quartzburg only after the Huangs' EB-5 visa petition was approved. Alternatively, the escrow agreement provided that the Huangs could seek a refund of their deposit from escrow if their EB-5 visa petition was denied. In total, the Quartzburg venture involved over $81 million of deposits into the escrow account from over 150 individual immigrant investors. 2-ER-109.

1

Ultimately, U.S. Citizenship and Immigration Services ("USCIS") denied the Huangs' EB-5 visa petition. But by the time the Huangs sought a refund of their $500,000 deposit, Quartzburg was mired in accusations of fraud and mismanagement.

In December 2015, two separate groups of immigrant investors (not including the Huangs) sued U.S. Bank, Quartzburg, and other entities affiliated with Quartzburg, alleging, in essence, that the entire investment scheme was a sham. *See Chen v. U.S. Bank*, No. 2:16-cv-01109-RSM (W.D. Wash.) ("*Chen*"); *Mao v. U.S. Bank*, No. 2:16-cv-01113-RSM (W.D. Wash.). The lawsuits involving Quartzburg revealed that nearly all the money held in escrow "was erroneously distributed by U.S. Bank prior to the approval of the investors' EB-5 visas." 1-ER-005 (citing *Chen*). Thus, although some of the immigrant investors received refunds, 2-ER-109, U.S. Bank released over $77 million of the immigrant investors' funds from escrow to Quartzburg, leaving almost all the other immigrant investors without a refund even though their EB-5 visa petitions were denied. *See* 2-ER-109.

By happenstance, in April 2021, during discovery in *Chen*, a U.S. Bank representative disclosed that there were still funds left in the escrow account. *See* 1-ER-005. U.S. Bank determined that $501,116 remained in the escrow account and identified the Huangs as the "Quartzburg investor who deposited" $500,000 of

2

those funds that were still held (and had never left) escrow. 3-ER-320-22. U.S. Bank notified the Huangs that it filed an interpleader action to resolve any claims to "the undisbursed funds." 3-ER-320.

This Court should reverse the district court's order directing that the interplead funds be released to Quartzburg. 1-ER-008; 2-ER-013. First, the Huangs were entitled to summary judgment and the return of their deposit from escrow under the terms of their escrow agreement with U.S. Bank and Quartzburg. The Huangs established that they deposited $500,000 into the escrow account and that their EB-5 visa petition was never approved. Under the Master Escrow Agreement, U.S. Bank was obligated to return the deposit to the Huangs.

Importantly, U.S. Bank—the escrow agent—identified $500,000 of the funds at issue in this case as the Huangs' deposit into the escrow account. According to U.S. Bank, the Huangs' deposit had never been released from the escrow account to Quartzburg. Although U.S. Bank filed this interpleader action, it named the Huangs as defendants who had a claim to the return of this deposit under the escrow agreement.

Second, Quartzburg's motion for summary judgment should have been denied because Quartzburg failed to demonstrate that the Huangs' deposit had actually been disbursed from the escrow account. The district court concluded that there was "insufficient evidence as to whose money was actually distributed in any

3

given distribution to Quartzburg." 1-ER-007. Thus, Quartzburg failed to meet its burden to show that the Huangs' deposit had already been disbursed and that Quartzburg was entitled to the funds as a matter of law.

Finally, the district court erred in its decision granting summary judgment to Quartzburg by focusing on the fact that multiple Quartzburg investors' deposits were "commingled" in the escrow account. 1-ER-007. Because the Master Escrow Agreement required U.S. Bank to account for and track each individual investors' deposits into and out of the escrow account, it does not matter that the escrow funds were physically commingled. U.S. Bank had a legal obligation to separately account for the Huangs' deposit, and in fact, U.S. Bank identified the funds at issue as being the Huangs' deposit. There was no justification for pro rata distribution of the Huangs' deposit from the escrow account to Quartzburg's defrauded investors.

Thus, the Huangs were entitled to summary judgment and the return of their deposit from escrow. Quartzburg's motion for summary judgment should have been denied.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this statutory interpleader action under 28 U.S.C. § 1335 because there is diversity between at least two of the claimants and the amount in controversy exceeds $500. *See Libby, McNeill, and Libby v. City Nat'l Bank*, 592 F.2d 504, 507 n.3 (9th Cir. 1978)

4

(noting statutory interpleader "allows so-called 'minimal' diversity, as distinguished from complete diversity, and requires only that $500 be in controversy in lieu of the usual . . . requirement."). The district court also had subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

The Huangs appeal the district court's January 19, 2022, order denying the Huangs' motion for summary judgment and granting Quartzburg's motion for summary judgment. 1-ER-008. The district court's order disposed of all claims and final judgment was issued on January 19, 2022. 1-ER-002. This Court has jurisdiction under 28 U.S.C. § 1291.

The Huangs filed a notice of appeal on February 18, 2022. 2-ER-010. This appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B) because it was brought within 30 days after entry of the final judgment.

## STATEMENT OF THE ISSUES

Under traditional principles of equity and federal common law, should funds deposited by an investor, held in escrow, and accounted for by the escrow agent be returned to the investor according to the terms of the escrow agreement after the conditions precedent for the release of the funds from escrow never occurred and the investor demands a refund, or should the investor's funds be disbursed to the escrow beneficiary—despite the failure to satisfy the conditions precedent for

disbursement of the funds—in order to allow for pro rata distribution to other investors who were defrauded by the escrow beneficiary?

## AUTHORITIES

The Appellants cite statutory and regulatory authorities only in their Statement of the Case.

## STATEMENT OF THE CASE

### 1. The EB-5 Program

Although not directly at issue in this appeal, a primer on the EB-5 Program may be helpful to the Court's understanding of the issues surrounding the escrow account in question. Congress created the Immigrant Investor Program, colloquially referred to as the EB-5 Program, as part of the Immigration and Nationality Act of 1990.[1] *See* Pub. L. No. 101-649, § 121(a) (Nov. 29, 1990) (codified at 8 U.S.C. § 1153(b)(5)). The EB-5 Program provides "legal permanent residency in the United States to foreign nationals who invest in U.S.-based projects." *SEC v. Hui Feng*, 935 F.3d 721, 725 (9th Cir. 2019). The purpose of the EB-5 Program is "to benefit the U.S. economy by providing an incentive for foreign capital investment in commercial enterprises that create or preserve U.S.

---

[1] "By statute, the Immigrant Investor Program is the fifth preference in the employment-based visa category, which gave rise to the nickname 'EB-5.' " *SEC v. Hui Feng*, 935 F.3d 721, 725 n.2 (9th Cir. 2019).

jobs." Dep't of Homeland Security, U.S. Citizenship and Immigration Services, Policy Manual, Vol. 6, Part G, Ch. 1, https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-1 (Jul. 6, 2023) ("EB-5 Policy").

At the time of the Huangs' EB-5 petition, immigrant investors could qualify for EB-5 visas by investing $1 million in a new commercial enterprise, or $500,000 in a business in a "targeted employment area." *See* 8 U.S.C. § 1153(b)(5)(C)(i)-(ii) (2012).[2] "Targeted employment areas" include "rural areas," which are "any area other than an area within a metropolitan statistical area or within the outer boundary of any city or town having a population of 20,000 or more." *Id*. at § 1153(b)(5)(B)(ii), (iii) (2012).

Immigrant investors may also pool their capital contributions through "regional centers" approved by USCIS. *See Hui Feng*, 935 F.3d at 726. A "regional center" is "any economic unit, public or private, which is involved in the promotion of economic growth." 8 C.F.R. § 204.6(e) (Jan. 2012). The EB-5 regional center "program allows economic entities to seek regional center status with USCIS for the purpose of soliciting and pooling funds from foreign national

---

[2]    In 2022, Congress amended the Immigration and Nationality Act by increasing the EB-5 Program qualifying amounts for capital investments and targeted employment area investments to $1,050,000 and $800,000, respectively. *See* Pub. L. No. 117-103. The 2022 amendments are not relevant to this appeal, and descriptions of the EB-5 Program's legal framework will refer to the laws in effect at the time of the Huangs' EB-5 petition.

investors and other private or public investors, to fund development projects in targeted employment areas." *Path Am. KingCo LLC v. U.S. Dep't of Homeland Sec.*, 426 F. Supp. 3d 770, 773 (W.D. Wash. 2019). Immigrant investors who applied through the regional center program were given priority status. *See Behring Reg'l Ctr. LLC v. Wolf*, 544 F. Supp. 3d 937, 942 (N.D. Cal. 2021).

The EB-5 Program process begins with the submission of an I-526 petition and supporting documentation to USCIS demonstrating that the immigrant investor's capital contribution meets the required investment criteria. *See Spencer Enters. v. United States*, 345 F.3d 683, 686 (9th Cir. 2003). "To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital *at risk* for the purpose of generating a return on the capital placed at risk." 8 C.F.R. § 204.6(j)(2) (Jan. 2012) (emphasis added).

Importantly, an immigrant investor's capital contribution may be placed into escrow pending approval of their I-526 petition. The USCIS's EB-5 Policy makes it clear that an "immigrant investor's money may be held in escrow until the investor has obtained conditional permanent resident status if the immediate and irrevocable release of the escrowed funds is contingent only upon" (a) "approval of the of the investor's petition for classification under [8 U.S.C. § 1153(b)(5)];" and

8

(b) "visa issuance and admission to the United States as a conditional permanent resident, or approval of the investor's Application to Register Permanent Residence or Adjust Status." EB-5 Policy at Ch. 2.A.2 ("Escrow Accounts"); *accord* 2-ER-067.

After receiving an I-526 petition, USCIS sends an acknowledgement to the petitioner on Form I-797 (Notice of Action). *See* USCIS, Form I-797C, Notice of Action, https://www.uscis.gov/forms/all-forms/form-i-797c-notice-of-action. However, Form I-797 is also used by USCIS to communicate all subsequent notices related to the petition, including receipt, rejection, transfer, and certain appointments regarding the petition. The Form I-797 makes it clear that the notice itself "does not grant any immigration status or benefit." *Id*.

Upon approval of an I-526 petition, the immigrant investor may receive conditional permanent resident status (a "green card"), which expires on the two-year anniversary date of approval. *See* 8 U.S.C. § 1186(b) (2012). Within 90 days of a green card's expiration date, the immigrant investor may file a petition to remove conditions on permanent resident status (Form I-829). *See* EB-Policy at Ch. 5. The immigrant investor's I-829 petition must include evidence of the completed capital investment that resulted in the creation of at least 10 full-time jobs. *See id*. If the immigrant investor's funds were held in escrow pending approval of the I-526 petition, USCIS approval of an I-829 petition "requires

evidence verifying that the escrowed funds were released and that the investment was sustained" for the two-year period of conditional permanent residence. *See id.* at Ch. 2.

### 2. The Master Escrow Agreement

The Huangs, along with hundreds of other immigrant investors (primarily from China) were recruited to invest in Quartzburg and related entities for the purpose of obtaining EB-5 visas. *See* 2-ER-061; *Doe*, 410 F. Supp. 3d at 92. ISRC—a USCIS-approved regional center formed and managed by an individual named Serofim (Sima) Muroff—purported to direct immigrant investors' funds to ventures in Idaho and Montana—rural areas that qualified for the lower investment threshold under the EB-5 Program—including Quartzburg. *See* 3-ER-273, 278; *Doe*, F. Supp. 3d at 92.

On April 16, 2012, U.S. Bank, Quartzburg, and ISRC entered into an escrow agreement (the "Master Escrow Agreement") establishing an escrow account in which to pool deposits from immigrant investors. *See* 3-ER-340-69. Individual immigrant investors subsequently subscribed to the Master Escrow Agreement by executing a "joinder," adopting and agreeing to be bound by the Master Escrow Agreement, and depositing $500,000 in the escrow account. *See* 3-ER-359 ("Exhibit A: Form of Joinder in Master Escrow Agreement").

10

The explicit purpose of the escrow account was to hold the immigrant investors' funds pending a determination from USCIS regarding their individual EB-5 petitions. *See* 1-ER-004. As the district court noted, the "Master Escrow Agreement set terms for individual investors to deposit funds into escrow pending sufficient evidence of the approval of their EB-5 immigration applications, at which time funds were to be disbursed." 1-ER-004.

Pursuant to Schedule A of the Master Escrow Agreement, any release of funds from the escrow account was contingent on either the (a) "Investor's I-526 Petition Approval" or (b) the "Investor's I-526 Petition Denial." 3-ER-352. If an immigrant investor's EB-5 visa petition was approved, the Master Escrow Agreement provided that certain documentation must be presented to U.S. Bank prior to disbursement of that specific investor's deposit:

> In the case of an I-526 petition approval, the Escrow Agent shall release the applicable Investor's funds upon Escrow Agent's receipt of (1) a Form I-797 Notice of Action evidencing Investor's I-526 petition approval, or an Immigrant Visa Application Processing Fee Bill Invoice issued by the U.S. Department of State National Visa Center evidencing the Investor's I-526 petition approval; or (2) a Written Direction provided by [Quartzburg] setting forth appropriate wire transfer instructions. 3-ER-352.

Exhibit I of Schedule A to the Master Escrow Agreement ("Written Instructions; Release of Investor Escrow Funds") consisted of a form that Quartzburg would use

11

to request the release of escrow funds by identifying the specific investor's name, the amount to be released, wire transfer instructions, and the applicable condition precedent under the Master Escrow Agreement triggering the release. 3-ER-355.

Once an immigrant investor's EB-5 visa petition was approved and that specific investor's $500,000 deposit was disbursed from escrow to Quartzburg, the investor became a limited partner in Quartzburg. 3-ER-264 ("Limited Partnership Agreement"). "An investor shall be admitted as Limited Partner upon the release of such investor's $500,000 capital contribution to the Partnership pursuant to the Escrow Agreement, either as a result of the USCIS's approval of the investor's I-526 petition or the express written consent of the investor to release such investor's capital contribution prior to such approval." 3-ER-264; *see also* 3-ER-278 ("Limited Partner Interest Subscription Agreement").[3]

Alternatively, if an immigrant investor's EB-5 visa petition was denied by USCIS, the Master Escrow Agreement provided that U.S. Bank would return the investor's deposit. 3-ER-352. "In the case of an I-526 petition denial, to the extent [U.S. Bank] has not previously released the applicable Investor's funds pursuant to

---

[3]     *See also Doe*, 410 F. Supp.3d at 92 n.3 ("The terms of the limited partnership, including the rights of the [investors], were set forth in the [Limited Partnership Agreement]. Under the [Limited Partnership Agreement], in return for their capital contributions the limited partners, in aggregate, were entitled to an 80% share of the partnership, with the general partner [ISR Capital, LLC] retaining the remaining 20%.").

the Issuer's Written Direction, [U.S. Bank] *shall release such funds to the Investor . . . ."* 3-ER-352 (emphasis added).

On November 6, 2012, the Huangs deposited $500,000 into the escrow account and entered into the Master Escrow Agreement by executing the joinder and Limited Partner Interest Subscription Agreement. *See* 2-ER-108-09. However, like other Quartzburg immigrant investors, the Huangs' EB-5 visa petition was initially denied by USCIS. 2-ER-061; *see generally Doe*, 410 F. Supp. 3d at 92-95.[4] The Huangs decided to appeal the USCIS's decision rather than seek an immediate refund and terminate their involvement with Quartzburg, which would mean giving up on their hopes to immigrate to the U.S. 2-ER-061. The administrative appeal process required the Huangs to leave their $500,000 deposit

---

[4] On February 24, 2015, an anonymous group of Quartzburg investors filed an Administrative Procedures Act lawsuit against USCIS claiming the denials of their I-526 petitions were arbitrary and capricious. *See Doe v. U.S. Customs and Immigration Servs.*, No. 1:15-cv-00273-CKK (D.D.C.). The first issue in *Doe* was whether the "call option" in Quartzburg's Limited Partnership Agreement satisfied the EB-Program's requirement that an immigrant investor's capital contribution be placed "at risk." *See Doe v. U.S. Customs and Immigration Servs.*, 329 F. Supp. 3d 297, 300 (D.D.C. 2017) (citing 8 C.F.R. § 204.6(j)(2)); 3-ER-264 ("The Partnership shall have an option ("Call Option"), but not an obligation to purchase the entire Interest owned by a Limited Partner [for a minimum of $550,000]. . . ."). The D.C. district court rejected USCIS's initial determination that the call option meant the Quartzburg investment was not "at risk" and remanded the investors' I-525 petitions to USCIS. *Doe*, 239 F. Supp. 3d at 306. After remand, the district court affirmed USCIS's second denial based on the investors' failure to establish that the Quartzburg ventures would be doing business in a targeted employment area and create at least ten qualifying jobs. *Doe*, 410 F. Supp. 3d at 108.

13

in escrow to meet the EB-5 investment requirements. *See* 2-ER-061. The Huangs'
EB-5 visa petition was never approved and the Huangs never consented to the
release of their deposit from escrow.

### 3. *Chen v. U.S. Bank* **and** *SEC v. Muroff*

While the Huangs and other investors were pursuing administrative appeals
regarding USCIS's denials of their EB-5 visa petitions, significant problems with
Quartzburg emerged. Some Quartzburg investors discovered that U.S. Bank had
released their deposits from escrow to Quartzburg before their EB-5 visas were
approved.

In December 2015, two groups of Quartzburg investors filed lawsuits in
federal court alleging that U.S. Bank breached the Master Escrow Agreement by
allowing unauthorized distributions from the escrow account to Quartzburg
resulting in the loss of each investor's $500,000 deposit.[5] *See Chen v. U.S. Bank*,
507 F. Supp. 3d 1254, 1257 (W.D. Wash. 2020). According to the *Chen* investor-
plaintiffs, they each received "acknowledgements" from USCIS that their I-526
petitions were "received," but "Quartzburg and Muroff intended to fraudulently
obtain the Escrowed Funds by asserting that the Acknowledgments were actually

---

[5]     *Chen v. U.S. Bank* and *Mao v. U.S. Bank* were both initially filed in the
federal district court for the District of Utah, and then transferred to the Western
District of Washington and consolidated.

approvals." Complaint at 6, *Chen v. U.S. Bank*, 507 F. Supp. 3d 1254 (W.D. Wash. 2020) (No. 2:16-cv-1109-RSM). The *Chen* investor-plaintiffs contended that Quartzburg submitted disbursement requests to U.S. Bank that did not include evidence of the investors' EB-5 visa approvals, and that U.S. Bank disbursed funds from escrow in response to Quartzburg's fraudulent requests. *Id*.

On March 3, 2020, the federal district court for the Western District of Washington issued factual findings explaining what had happened with the Quartzburg escrow account:

> Between September 10, 2012, and March 7, 2014, [Quartzburg's representative] issued seven Written Directions instructing U.S. Bank to disburse portions of escrowed funds to Quartzburg. Each was substantially similar and substantially in the form of Exhibit I to Schedule A to the Escrow Agreement. Each Written Direction included a list of investors who had received Form I-797s from USCIS and for which Quartzburg was directing disbursement. Each attached copies of Form I-797's for the identified investors . . . Although these forms did not reflect approval of the investors' I-526 petitions, the Written Directions expressly 'direct[ed] release' of the identified escrow funds and expressly represented that the directed 'release is in accordance with Exhibit I of Schedule A to the Escrow Agreement' based on the investor's 'Receipt of [Form] I-797C from USCIS.
>
> According to submitted declarations, U.S. Bank's Escrow Department believed that the Form I-797 Notice of Action forms provide by Quartzburg were the documents

15

that triggered U.S. Bank's contractual duty to release the funds to Quartzburg. [The investor's] funds were thus erroneously disbursed by U.S. Bank to Quartzburg in September 2013. *Chen v. U.S. Bank*, No. 2:16-cv-1109RSM, 2020 U.S. Dist. LEXIS 36773 * 5-7 (W.D. Wash. Mar. 3, 2020) (internal citations omitted).

The *Chen* plaintiffs reached settlement agreements dismissing their claims against U.S. Bank, Quartzburg, and other entities affiliated with Quartzburg, *see generally* No. 2:16-cv-1109RSM, but other groups of Quartzburg investors raised similar allegations in separate lawsuits. *See Fan v. U.S. Bank*, No. 2:19-cv-01545-RSM (W.D. Wash.); *Shao v. Muroff*, No. 1:18-cv-00295-BLW (D. Idaho); *Luo v. Quartzburg*, No. 16-2-21975-6-SEA (Wash. Super. Ct.). The Huangs were not parties to any of the lawsuits alleging fraud or wrongdoing with respect to the escrow account.

In addition to the private lawsuits against Quartzburg, on April 28, 2017, the U.S. Securities and Exchange Commission ("SEC") filed an enforcement action against Quartzburg's general partner, ISR Capital, LLC, and financial advisor, Muroff—who was also the chief executive officer of ISRC. *See SEC v. Muroff*, No. 1:17-cv-00180-EJL, 2018 U.S. Dist. LEXIS 221745 at * 3 (D. Idaho Dec. 4, 2018). According to SEC's civil complaint, "[f]rom 2012 to 2013, Muroff and ISR Capital raised $78 million from 156 investors, primarily from China, through Quartzburg Gold." Complaint at 8, *SEC v. Muroff*, No. 1:17-cv-00180-EJL, 2018 U.S. Dist.

16

LEXIS 221745 (D. Idaho). "Muroff used approximately $5 million of investor funds he diverted from Blackhawk Gold and Quartzburg Gold . . . to enrich himself and to benefit his own personal business ventures." *Id*. at 10. Muroff "engaged in a series of acts designed to hide his misappropriation from both investors and USCIS, including secretly using investor funds to purchase the real estate and mining assets for himself and then 'selling' them back to investors at an inflated price so he could pocket the profit." *Id*. at 2. "Muroff also improperly used investor funds (which he funneled through [a separate entity] to pay $5.6 million to the company that solicited investors in China. This allowed him to continue raising more money to perpetuate his scheme." *Id*. at 7.

On May 10, 2017, the federal district court for the District of Idaho entered final judgment according to a settlement reached by the SEC and Muroff. *See* 2-ER-089 (Final Judgment as to Defendants, *SEC v. Muroff*, No. 1:17-cv-00180-EJL (D. Idaho)). Under the final judgment, Muroff did not admit or deny the allegations in the complaint but agreed to pay a $2-million civil penalty to the SEC and disgorge more than $5 million in assets. 2-ER-089, 094. Muroff's associated entities agreed to retain an independent manager to replace Muroff as the chief executive officer of ISR Capital and an independent monitor "to protect the interests of the investors who have purchased securities in [entities including Quartzburg] in connection with the EB-5 Immigrant Investor Program." 2-ER-097-

17

98. The final judgment in *SEC v. Muroff* specifically directed the independent manager to identify "all [i]nvestors whose money or assets were in the custody or control" of Quartzburg. 2-ER-099.

On December 4, 2018, the Idaho district court denied the independent manager's motion to stay the *Shao* and *Chen* Quartzburg investor lawsuits. *See* Order, *SEC v. Muroff*, No. 1:17-cv-00180-EJL, 2018 U.S. Dist. LEXIS 221745 (D. Idaho Dec. 4, 2018). The Idaho district court noted that the final judgment "contemplates the existence of parallel proceedings or 'Related Investor Action[s]' defined as 'private damages action[s] brought against any Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action,' " *id*. at 5, and concluded that "the individual investors have their own interests in proceeding with their private claims against the Muroff Defendants and others." *Id*. at 20.

### 4. Proceedings Below

During discovery in *Chen*, a U.S. Bank representative disclosed that the Quartzburg escrow account remained open, 2-ER-116, and U.S. Bank determined the escrow account had a balance of $501,116. *See* 3-ER-372. U.S. Bank notified the Huangs that they were the "Quartzburg investor who deposited" $500,000 of the remaining funds, and on June 26, 2020, U.S. Bank filed this interpleader action. 3-ER-320-22; 3-ER-370.

18

The Huangs and Quartzburg each filed answers and cross-claims to U.S. Bank's interpleader complaint. *See* 3-ER-323; 3-ER-332. On April 26, 2021, the Huangs moved for summary judgment, arguing that $500,000 of the interplead funds should be returned to them because their "funds constitute virtually all of the funds at issue in this action, as demonstrated by U.S. Bank's business records, which clearly attributed those funds" to the Huangs. Quartzburg filed a cross-motion for summary judgment, relying on the declaration of Quartzburg's independent monitor, Krista Freitag. *See* 2-ER-106. The Freitag declaration admitted that the Huangs deposited $500,000 into the escrow account, 2-ER-108, but represented that because the escrow account included "aggregated/combined" funds from multiple investors, "there is no credible way to determine to whom the remaining $500,000 specifically belongs." 2-ER-109-110.

On January 19, 2022, the district court denied the Huangs' summary judgment motion and granted Quartzburg's cross-motion, directing that the interplead funds be released to Quartzburg. 1-ER-008. The court concluded that the Huangs "failed to present sufficient evidence that their escrow deposit was segregated and not co-mingled for purposes of investing in this project." 1-ER-007. "The Court finds that allowing [the Huangs] to receive their funds, previously comingled with the other investors and relied on by the Huang Defendants for the benefit of obtaining EB-5 visas, is not supported by case law and would be akin to

allowing 'one fraud victim to recover all of his losses at the expense of other victims' based solely on luck." 1-ER-007-08 (quoting *SEC v. Bivona*, No. 16-cv-01386-EMC, 2017 U.S. Dist. LEXIS 148575 (N.D. Cal. Sept. 13, 2017)).

The Huangs appeal.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's order directing that the interplead funds be released to Quartzburg. First, the district court erred in denying the Huangs' motion for summary judgment. The Huangs demonstrated that they were entitled to judgment as a matter of law because it was undisputed that they deposited $500,000 into the escrow account and the condition precedent for disbursement of their funds to Quartzburg never occurred. U.S. Bank identified the Huangs as the Quartzburg investor who had deposited $500,000 of the funds at issue and which funds had remained in U.S. Bank's control at the time of the interpleader action.

The district court erred by focusing on the fact that the escrow account was commingled and held deposits from multiple Quartzburg investors. That focus was misdirected because the escrow agent, U.S. Bank, had a fiduciary duty and an obligation under the Master Escrow Agreement to account for each investors' deposit into and out of the escrow account. U.S. Bank actually tracked each disbursement from escrow, and by naming the Huangs as a defendant in this action,

U.S. Bank determined that the Huangs had a claim to the $500,000 under the Master Escrow Agreement. Quartzburg failed to meet its burden to establish a genuine issue of material fact disputing the Huangs' claim to the funds. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).

Second, Quartzburg's motion for summary judgment should have been denied because Quartzburg failed to demonstrate that it was entitled to the interplead funds instead of the Huangs. Quartzburg's claim to the funds was premised on its contention that all of the Quartzburg investors were similarly situated and had been defrauded. But Quartzburg failed to present evidence—other than a conclusory declaration and opinion testimony—that the Huangs' deposit specifically had been fraudulently released from the escrow account. *See Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) ("On summary judgment, the moving party bears the burden of establishing the basis for its motion and identifying the evidence that demonstrates the absence of a genuine issue of material fact."). The district court concluded that there was "insufficient evidence as to whose money was actually being distributed in any given distribution to Quartzburg." 1-ER-007. Thus, summary judgment in favor of Quartzburg was inappropriate.

Third, and finally, if this Court concludes that Quartzburg had sufficiently raised a genuine issue of material fact regarding the Huangs' claim to the funds, on

21

remand this Court should clarify that the rule of pro rata distribution does not apply to funds remaining in escrow. The district court reasoned that even "if the [Huangs] had submitted adequate evidence that these remaining funds were tracible to their investment . . . equity would demand pro rata distribution." 1-ER-007. But the equitable rule of pro rata distribution does not apply to circumstances such as this where where the legal title to the funds in an escrow account remains in the investor. *Cf. City of Philadelphia v. Lieberman*, 112 F.2d 424, 426 (3d Cir. 1940) (ordering return of funds held in trust that were beyond the control of the court-appointed receiver). There was no justification for treating the Huangs as similarly situated to Quartzburg's fraud victims without a factual determination that the Huangs had actually been defrauded.

## STANDARD OF REVIEW

This Court reviews the district court's decision on summary judgment cross motions de novo. *See Csutoras v. Paradise High Sch*., 12 F.4th 960, 965 (9th Cir. 2021). On appeal from summary judgment, this "Court's review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." *Suzuki Motor Corp. v. Consumers Union, Inc.,* 330 F.3d 1110, 1131 (9th Cir. 2003).

The Court views "the evidence in the light most favorable to the nonmoving party" and determines "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Soc.*

*Techs. LLC v. Apple, Inc*., 4 F.4th 811, 816 (9th Cir. 2021) (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc*., 408 F.3d 596, 602 (9th Cir. 2005)). Summary judgment is inappropriate if there are unresolved material factual issues. *See Simo v. Union of Needletrades*, 322 F.3d 602, 609-10 (9th Cir. 2003) ("Summary judgment is improper if there are any factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986))).

Although "[i]t is generally recognized that interpleader 'developed in equity and is governed by equitable principles,' " *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1033-34 (9th Cir. 2000) (quoting *Lummis v. White*, 629 F.2d 397, 399 (5th Cir. 1980), *rev'd on other grounds by Cory v. White*, 457 U.S. 85 (1982)), competing claims to the interplead funds may be resolved by summary judgment motion, which is then reviewed de novo on appeal. *See Minn. Mut. Life Ins. Co. v. Ensley*, 174 F.3d 977, 981 (9th Cir. 1999).

## ARGUMENT

**I.     The Huangs Were Entitled to Summary Judgment and the Return of their $500,000 Deposit Because the Condition Precedent for Releasing their Funds from Escrow Never Occurred.**

The district court should have ordered the interplead funds be returned to the Huangs according to the Master Escrow Agreement, which provided that if the

Huangs' EB-5 petition was denied by USCIS, U.S. Bank was required to return the Huangs' deposit. 3-ER-352. To prevail on summary judgment, the Huangs were required only to establish that they deposited $500,000 into the escrow account and that the condition precedent for release of their deposit never occurred. Both of those facts are undisputed. Because U.S. Bank—the escrow agent—identified the Huangs as the depositor of $500,000 at issue in this interpleader action, *see* 3-ER-320-21, nothing more was required for the Huangs to demonstrate that they were entitled to summary judgment and the return of their funds.

First, it is undisputed that the Huangs deposited $500,000 into the escrow account on November 6, 2012. 2-ER-108-09. It was reasonable for the Huangs to believe that U.S. Bank would hold those funds in trust pending the occurrence of the condition precedent specified in the Master Escrow Agreement (USCIS's approval of the Huangs' EB-5 visa petition). 3-ER-352; *see Nat'l Bank of Wash. v. Equity Investors*, 506 P.2d 20, 35 (Wash. 1973) ("As a general rule, the escrow holder must act strictly in accordance with the provisions of the escrow agreement; he must comply strictly with the instructions of the parties, and it is his duty to exercise ordinary skill and diligence, and due or reasonable care in his employment." (quoting 30A C.J.S. Escrows § 8 (1965)).[6]

---

[6] The Master Escrow Agreement includes a choice of law clause designating Washington state law as controlling. *See* 3-ER-350.

24

Second, it is also undisputed that the condition precedent for release of the Huangs' deposit from the escrow account to Quartzburg never occurred. USCIS denied the Huangs' EB-5 visa petition, and the Huangs never otherwise consented to releasing their deposit to Quartzburg. U.S. Bank determined that the Huangs had deposited $500,000 of the funds at issue in this action and notified the Huangs of that determination. 3-ER-320-22. Thus, as a matter of law, the Huangs were entitled to enforce the Master Escrow Agreement's provision requiring the return of their $500,000 deposit from U.S. Bank. *See Marianas Pub. Land Trust v. Gov't. of N. Mariana Islands*., 838 F.2d 341, 345 (9th Cir. 1988) ("On nonperformance of the condition, the depositor is entitled to return of the property."); 28 Am. Jur.2d Escrows § 27 (May 2023) ("When the condition upon which an escrow is to be delivered is not complied with, the depository is obligated to deliver the instrument to the depositor."); 30A C.J.S. Escrows § 37 (May 2023) ("[O]n nonperformance the depository holds the instrument or property for the benefit of the depositor, and if the depositary fails or refuses to redeliver the instrument or other property, the depositary may be liable therefor to the depositor . . . .").

The district court concluded that the Huangs "failed to present sufficient evidence that their escrow deposit was segregated and not co-mingled for the purposes of investing in this project." 1-ER-007. But it was never a required element of the Huangs' claim to prove that their funds were physically segregated

within the escrow account. As the escrow agent, U.S. Bank had an independent legal obligation to protect the Huangs' deposit and only release it to Quartzburg according to the terms of the Master Escrow Agreement, regardless of whether the Huangs' deposit was commingled with other investors' deposits. *See also* 3-ER-369 (provision in escrow agreement contemplating that commingled investor deposits would be invested by U.S. Bank).

It is blackletter law that a deposit into an escrow account creates a fiduciary relationship between the escrow agent and depositor. *See* Restatement (Second) of Trusts § 32 cmt. d (2012) ("At the time of the delivery in escrow there is a presently created trust . . . ."). "[T]he escrow holder owes a fiduciary duty to his principal in the same way that all agents are held to such standards." *Nat'l Bank of Wash.*, 506 P.2d at 35.

The Huangs' deposit into the escrow account was not like an ordinary deposit into bank account or a direct payment to Quartzburg; it was a conditional delivery. *See* 4 Tiffany, Real Property § 1048 (3d ed., Sept. 2022). "Once deposited in escrow, an instrument passes beyond the control of the depositor, and he may not recall it. Upon the performance of the condition named, the depository must deliver it to the grantee." *Lechner v. Halling*, 216 P.2d 179, 185 (Wash. 1950) (citing 30A C.J.S. Escrows). Legal title to the funds remained with the Huangs until the condition precedent occurred. *See Marianas*, 838 F.3d at 345 ("Where an

escrow is created, until performance of the condition on which delivery is to be made, legal title to the property placed in escrow remains in the depositor."); *see also In re Cannon*, 277 F.3d 838, 851 (6th Cir. 2002) (concluding client funds held in attorney's escrow account were not part of attorney's bankruptcy estate); 30A C.J.S. Escrows § 6 (May 2023) ("Until the performance or condition, or the happening of the event, on which delivery is to be made by the depository, the legal title . . . to [the] matter placed in escrow, remains in the grantor or depositor . . . .").

The fact that U.S. Bank commingled the Huangs' deposit in the escrow account with other investors is immaterial to the Huangs' claim. Escrow accounts are often pooled accounts consisting of deposits from multiple depositors. *See, e.g., Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 843 (9th Cir. 2001) (noting lawyer trust accounts may be pooled). Commingling does not defeat the escrow agent's fiduciary duties to each individual depositor. The escrow agent must follow the escrow agreement's direction to release individual deposits only upon the satisfaction of a specified condition precedent with respect to each individual depositor. *See Nat'l Bank of Wash.*, 506 P.2d at 35; 30A C.J.S. Escrows § 21 (May 2023) ("The escrow agent has a duty not to deliver the monies in escrow except upon strict compliance with the conditions imposed by the controlling agreement."). Thus, where, as here, the escrow agreement provides that

certain conditions precedent apply to each depositor individually, the escrow agent must separately account for and track each individual depositor's funds into and out of the escrow account as part of the escrow agent's fiduciary duties. *See Nat'l Bank of Wash*., 506 P.2d at 35; Bogert's The Law of Trusts and Trustees § 966 (June 2023) ("[T]he trustee is under a duty to provide detailed accounts from which the beneficiary can learn whether the trustee has performed its trust and what the current status of the trust is."). Courts presume that escrow agents "have held sacred the trust fund" and performed their fiduciary duties. *See Scully v. Pac. States Sav. & Loan Co*., 88 F.2d 384, 387 (9th Cir. 1937).

Here, U.S. Bank's fiduciary duties as an escrow agent and the terms of the Master Escrow Agreement obligated U.S. Bank to disburse the Huangs' funds only if their EB-5 visa petition was approved by USCIS, and only after Quartzburg submitted written directions demonstrating that USCIS approval was granted and authorizing disbursement of the Huangs' investment specifically. 3-ER-352. U.S. Bank actually tracked each Quartzburg investor's deposit into and out of the escrow account as it was required to do. 2-ER-125. According to U.S. Bank, when Quartzburg submitted written directions to release individual investors' funds from escrow, U.S. Bank would "verify that each investor listed in the disbursement demand had deposited the required amount and that the amount had not already

28

been disbursed." 2-ER-121.[7] U.S. Bank "would also confirm that identification

information and government forms were received for each investor identified in the

disbursement direction," 2-ER-121, and "compare the list of names in the written

direction to the names on [U.S. Bank's] internal spreadsheet" for tracking

Quartzburg investors. 2-ER-125; *see* 2-ER-236-41 (U.S. Bank's redacted internal

spreadsheet of Quartzburg investors).

U.S. Bank unequivocally determined that the Huangs were the "Quartzburg

investor who deposited" $500,000 "of the funds at issue." 3-ER-320-22.[8] Thus,

because it is undisputed that the Huangs deposited $500,000 into the escrow

account, the condition precedent for the release of the Huangs' deposit never

occurred, and no evidence has been produced that would indicate that the Huangs

were ever identified on a written direction from Quartzburg as an investor for

whom Quartzburg was directing disbursement, *see* 2-ER-121; 2-ER-130-241

(records of Quartzburg disbursement requests), the Huangs were entitled to

summary judgment and the return of their deposit. Quartzburg failed to meet its

---

[7]     Quartzburg objected to the admissibility of U.S. Bank's declarations
submitted as evidence in *Chen, see* 2-ER-049-59; however, the district court
granted summary judgment without ruling on the objections.

[8]     The fact that U.S. Bank took no position on the Huangs' and Quartzburg's
competing claims to the funds, and instead filed this interpleader action, had no
effect on U.S. Bank's initial factual determination that $500,000 of the funds were
deposited by the Huangs. *See generally* 30A C.J.S. Escrows § 39 (May 2023)
(recognizing escrow agent may file interpleader to determine rights to funds).

29

burden to raise a genuine issue of material fact regarding whether the Huangs'
deposit was fraudulently released from the escrow account. *See infra*.

**II.      Quartzburg's Motion for Summary Judgment Should Have Been
         Denied Because It Failed to Show the Huangs' Deposit Was
         Disbursed from the Escrow Account.**

In their arguments below, the Huangs relied on an analogous case in which
immigrant investors' deposits that remained in escrow were returned to those
investors rather than being distributed to other defrauded investors pro rata. In *SEC
v. Path America, LLC*, the federal district court for the Western District of
Washington examined a nearly identical fact pattern to this case, involving an EB-5
Program investment venture in which immigrant investors' funds were held in
escrow pending USCIS approval of their visa petitions. No. C15-1350-JLR, 2016
U.S. Dist. LEXIS 47337 at * 4-5 (W.D. Wash. Apr. 6, 2016). The court granted ten
of the Path America investors' requests for the return of their deposits from escrow,
acknowledging that the deposits had never been disbursed from the escrow
account. *See id*. at * 4-5. Like the *Path America* investors, the Huangs' deposit
should have been returned to them from the escrow account.

Here, the district court attempted to distinguish *Path America* based on its
erroneous assumption that the Huangs were similarly situated to the other
defrauded Quartzburg investors. The district court concluded that there was
"insufficient evidence as to whose money was actually being distributed in any

given distribution to Quartzburg." 1-ER-007. But the Huangs were not required to determine which Quartzburg investors' deposits had been fraudulently released from the escrow account or disprove Quartzburg's competing claim to the funds. *See Celotex Corp.*, 477 U.S. at 323 (concluding moving party is not required to "support is motion with affidavits or other materials *negating* the opponent's claim") (emphasis in original) (citing Fed. R. Civ. P. 56). The Huangs relied on relied on U.S. Bank's determination that they "were the Quartzburg investor who deposited" $500,000 of the funds at issue. *See* 3-ER-320-22. Instead, it was Quartzburg's burden to submit evidence that the Huangs' deposit was fraudulently released from the escrow account, *see Celotex*, 477 U.S. at 323; *Davis*, 854 F.3d at 598, and Quartzburg failed to make that required showing.

The district court's conclusion that there was insufficient evidence showing that the Huangs' deposit was fraudulently released from escrow means that Quartzburg's cross motion should have been denied, and not the Huangs'. Quartzburg's cross motion for summary judgment and opposition to the Huangs' motion was premised on its contention that the Huangs' deposit had been released from the escrow account. *See* 2-ER-042. Thus, Quartzburg had the burden of supporting its contention with affidavits "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

31

Here, Quartzburg failed to establish "whose money was actually being distributed in any given distribution to Quartzburg," 1-ER-007. Quartzburg relied on business records produced by Muroff listing the "Quartzburg Gold Active Investors as of Mar. 18, 2015," which included Ying Lin as one of the 118 "active investors," but that evidence only supports the proposition that as of March 18, 2015, the Huangs had not requested a refund. 2-ER-021. That fact is unsurprising given the Huangs were still actively pursuing their EB-5 visa petition at that time. *See* 2-ER-061.

There was no evidence that Quartzburg had fraudulently requested the release of the Huangs' deposit from escrow, and no evidence to refute U.S. Bank's determination that the Huangs' deposit had not been released. Quartzburg did not present any evidence that the Huangs were listed on the any of the four disbursement requests submitted to U.S. Bank after the Huangs' deposit into escrow on November 6, 2012. *See*, *e.g*., 2-ER-130-235 (examples of written directions from Quartzburg identifying individual investors but not the Huangs). Quartzburg had access to those written directions to U.S. Bank listing each individual investor whose deposit was to be released, and presumably Quartzburg would have been able to show if the Huangs were named on those disbursement requests. *See* 2-ER-130-241. By not submitting that evidence, Quartzburg failed to

32

show that it was entitled to summary judgment and that the Huangs were not entitled to the return of their deposit.

Quartzburg's only other evidence—declarations from its independent monitor and manager—do not directly dispute U.S. Bank's determination that the Huangs were the source of the $500,000 at issue. For example, according to the independent monitor, Freitag, after reviewing U.S. Bank escrow account statements and Quartzburg's own business records, "one cannot discern the specific source of funds transferred and/or otherwise released." 2-ER-110. However, Freitag's conclusory declaration does not address, let alone provide any facts to dispute U.S. Bank's internal records of which Quartzburg investors' deposits were released from the escrow account. *See* 2-ER-236-41. It is unsurprising that an entity engaged in wide-ranging fraud would not produce the very records implicating it in alleged fraud committed against the Huangs. Nevertheless, that was Quartzburg's burden, and it failed to demonstrate that it was entitled to the interplead funds.

Based on the evidence presented, even if Quartzburg had raised a genuine issue of material fact regarding whether the Huangs' deposit had been released from the escrow account, it would have been appropriate to deny both motions for summary judgment. *See Eat Right Foods, Ltd. v. Whole Foods Mkt., Inc*., 880 F.3d 1109, 1121-22 (9th Cir. 2017). On de novo review, if this Court concludes that

33

Quartzburg has sufficiently raised a factual issue, the appropriate remedy is to remand for a determination as to whether the Huangs' deposit was in fact released from the escrow account. *See Porter v. Cal. Dep't of Corr*., 419 F.3d 885, 896 (9th Cir. 2005) (reversing summary judgment and remanding).

Importantly, if this Court were to affirm, the district court's implicit finding that the Huangs were victims of Quartzburg's fraud leaves the Huangs in a precarious position going forward. The district court did not issue factual findings that the Huangs' deposit had actually been released from the escrow account to Quartzburg. And neither the district court nor Quartzburg explained how specifically the funds released to Quartzburg would be returned to the defrauded investors, other than "pro rata." 1-ER-007; 2-ER-013. Going forward, it is not a foregone conclusion that the Huangs would have a successful claim against either U.S. Bank or Quartzburg for damages or a pro rata share of the funds now in Quartzburg's hands. Thus, it is likely that district court's order to release the funds to Quartzburg will produce inequitable results; the order provides Quartzburg and its other investors—who were actually defrauded—with a potential windfall at the Huangs' expense. At the very least, the case should be remanded for discovery into whether the Huangs' deposit was in fact released to Quartzburg.

### III.    The Rule that Equity Demands Pro Rata Distribution Does Not Apply to Funds Held in an Escrow Account.

Finally, if this Court remands to the district court to determine whether the Huangs' deposit was released from the escrow account to Quartzburg, the remand order should clarify that the equitable rule of pro rata distribution does not apply to funds held in escrow. The district court concluded that "[e]ven if the [Huangs] had submitted adequate evidence that these remaining funds were tracible to their investment . . . equity would demand pro rata distribution." 1-ER-007. But that decision misapplies the equitable rule of pro rata distribution, which is based on the impossibility of tracing commingled assets derived from multiple fraud victims. *See Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (concluding that multiple victims of the original Ponzi scheme should be compensated based on pro rata distributions); *U.S. v. Real Property Located at 13328 & 13324 State Hwy., 75 N.*, 89 F.3d 551, 553 (9th Cir. 1996) ("[T]racing fictions should not be utilized under circumstances involving multiple victims and commingled funds.").

Federal courts sitting in equity have long applied the rule that commingled assets derived from multiple fraud victims should be distributed to those victims on a pro rata basis rather than through applying the "first in, first out" rule or "tracing fictions." *See, e.g.*, *Cunningham*, 265 U.S. at 13 (distinguishing traditional equitable principles of asset distribution from *Clayton's Case*, 1 Merivale 572

35

(1816 Ch.) and *Knatchbull v. Hallett*, L.R. 13 Ch. D. 696); *United State v. Wilson*, 659 F.3d 947, 956 (9th Cir. 2010) (noting in dicta that "courts generally will not indulge in tracing when doing so would allow one fraud victim to recover all of his losses at the expense of other victims"). A common theme among cases in which courts applied pro rata distribution is that the victims' funds had been transferred to the wrongdoer and were either completely dissipated or impossible to trace through complex transactions and transfers involving multiple victims. *See, e.g.*, *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd*., 205 F.3d 1107, 1116 (9th Cir. 1999) (affirming receiver's plan to distribute disgorged assets to investors pro rata where "there are no company customer records for the purpose of segregating accounts"); *SEC v. Bivona*, No. 16-cv-01386-EMC, 2017 U.S. Dist. LEXIS 148575 at * 20 (N.D. Cal. Sept. 13, 2017) ("In situations involving mismanagement, poor record-keeping, or diversion of investor funds, it is often difficult if not impossible to successfully trace all claims."); *SEC v. Byers*, 637 F. Supp.2d 166, 177 (S.D.N.Y. 2009) ("The Receiver considered and rejected tracing, based on equitable grounds—and on the recommendation of his accountants that tracing would be 'difficult, time-consuming, and expensive—and the ultimate benefit to the estate would be minimal at best.' "). It is clear from those cases that "equality is equity" among similarly situated fraud victims. *Cunningham*, 265 U.S. at 13; *Real Property Located at 13328 & 13324 State Hwy., 75 N*., 89 F.3d at 551

36

(affirming allocation of proceeds to fraud victims pro rata regardless of whether victims could trace their individual funds); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) ("To the district court, all the fraud victims were in equal positions and should be treated as such."); *SEC v. Byers*, 637 F. Supp.2d 166, 179-80 (S.D.N.Y. 2009) ("To determine whether parties are similarly situated . . . their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." (quoting *Lizardo v. Denny's, Inc*., 270 F.3d 94, 1010 (2d Cir. 2001)).

In contrast, where legal title was never transferred or the assets were never placed under the defrauder's control, courts have ordered the assets be returned to the claimant. In *SEC v. Credit Bancorp, Ltd*., the Court of Appeals for the Second Circuit distinguished a line of cases in which "the reason the assets were returned was not merely because they were traceable, but because the assets had somehow been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control." 290 F.3d 80, 90 (2d Cir. 2002) (citing *SEC v. Black*, 163 F.3d 188, 196-97 (3d Cir. 1998); *Anderson v. Stephens*, 875 F.2d 76, 80 (4th Cir. 1989); *City of Philadelphia v. Lieberman*, 112 F.2d 424, 426 (3d Cir. 1940)).

Notably, in *City of Philadelphia v. Lieberman*, the Third Circuit concluded that assets held in an actual trust must be returned rather than liquidated as part of an insolvent's estate because those assets were never under the control of the

insolvent entity. 112 F.2d 424, 426 (3d Cir. 1940). According to the Third Circuit, "it is settled that a receiver of an insolvent is not entitled to possession of securities lawfully held in trust." *Id*. The "contractual right to the continuation of the trust . . . may not be impaired by a court of equity." *Id*. The same reasoning should apply to an escrow account, which is a form of trust used to convey property upon the occurrence of a condition precedent. *See Lechner*, 216 P.2d at 185.

Here, the Huangs' deposit was held in trust by U.S. Bank in an escrow account governed by the Master Escrow Agreement. According to U.S. Bank, the Huangs' deposit was always separately accounted for and had never left the escrow account, which is consistent with the Huangs' expectations given that the condition precedent for the disbursement of their deposit never occurred. Legal title had always remained with the Huangs. *See Marianas Pub. Land Trust*, 838 F.2d at 345; *Credit Bancorp*, 290 F.3d at 90. And importantly, if the $500,000 at issue was deposited by and traceable to the Huangs—as the district court apparently assumed—then the Huangs would not be similarly situated to Quartzburg's other fraud victims. *See Durham*, 86 F.3d at 73. There was no fraud committed against the Huangs if their deposit remained in the escrow account as it was supposed to all along. Thus, there was no need for "tracing fictions" or pro rata distribution in this case.

38

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment to Quartzburg and denial of summary judgment to the Huangs. The Huangs are entitled to the return of their $500,000 deposit from the escrow account pursuant to the Master Escrow Agreement. Because U.S. Bank identified the Huangs as the investor who deposited $500,000 of the funds at issue in this interpleader action, and Quartzburg failed to offer evidence that the Huangs' deposit had already been fraudulently released from escrow, the district court should have entered judgment for the Huangs as a matter of law.

Respectfully submitted on July 31, 2023.

LANDYE BENNETT BLUMSTEIN LLP
Attorneys for Appellants Ying Lin and Yun Huang

*/s/ Andrew Erickson*

_____

Andrew Erickson, Alaska Bar No. 1605049

## STATEMENT OF RELATED CASES

The Appellants are not aware of any related cases pending before this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED: July 31, 2023.

LANDYE BENNETT BLUMSTEIN LLP
Attorneys for Appellants Ying Lin and Yun Huang

*/s/ Andrew Erickson*

_____
Andrew Erickson, Alaska Bar No. 1605049

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-35146

I am the attorney or self-represented party.

**This brief contains** | 9,204 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Andrew Erickson | **Date** | July 31, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*